UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

          Plaintiff,                CIVIL ACTION No.

     v.                    HON.

JOEL I. WILSON, DIVERSIFIED
GROUP PARTNERSHIP MANAGEMENT,    JURY DEMANDED
LLC, and AMERICAN REALTY FUNDS
CORPORATION,

          Defendants.
_____/

## COMPLAINT

Plaintiff, Securities and Exchange Commission ("Commission"), alleges and states as follows:

## SUMMARY

1.    The Securities and Exchange Commission brings this civil law enforcement action to protect 120 members of the public who stand to lose most of the $6.7 million they have invested with Defendant Joel I. Wilson and two companies he owns and controls, Defendants Diversified Group Partnership Management, LLC ("Diversified Group") and American Realty Funds Corporation ("American Realty").  Wilson, acting through his companies and others, obtained the investors' money through fraud and deception.  And now he lacks the wherewithal to repay his victims.  Immediate action is needed from this Court to limit the harm to existing investors and to stop the Defendants before they attract still more innocent people to their scheme.

2.      From 2009 through the present, Wilson has engaged in the business of buying, renovating, and reselling properties in and around Bay City, Michigan.   For most of that time, Wilson has conducted his real estate business through his two companies, Diversified Group and American Realty.

3.      From 2009 through as recently as September 2012, Wilson has also engaged in another business activity—raising millions of dollars by selling securities to members of the public. During that time, Wilson, personally and through other persons working for him, raised approximately $6.7 million from approximately 120 investors by offering and selling securities tied to his real estate business.   Wilson raised $900,000 by selling debentures issued by Diversified Group and about $5.8 million by selling interests in 17 limited partnerships ("LPs").

4.      Through written offering documents and two sales agents, Wilson promised investors that he would use their money to buy secured interests in land contracts under which his companies were selling renovated properties.   Wilson also promised the investors that they would be repaid with the payments made by the purchasers of the properties.  In fact, however, instead of acquiring secured interests in the land contract transactions, Wilson used most of the investor money to make unsecured loans from the limited partnerships to his two companies, Diversified Group and American Realty.  And on top of that, Wilson diverted at least $582,000 from accounts containing investor money to pay personal expenses, including, for example, $75,000 he used to buy securities broker W R Rice, $35,000 he spent on his wife's business, $7,914 he used to buy Detroit Red Wings tickets, $13,160 he paid for a sponsorship of and tickets to the Saginaw Sting, and $46,780 he spent on travel.

5.      The truth is that Wilson's real estate business does not generate enough income to repay the debentures and limited partnership investments.  Wilson did not disclose this inconvenient

truth to the investors.  Instead, when his companies' notes to the limited partnerships came due, Wilson unilaterally extended the maturities of those notes.

6.      Wilson has admitted under oath that he made misleading statements to investors about numerous matters, including the inaccuracy of the offering documents, the misuse of investor funds, and the lack of funds to pay the interest owed to investors from the promissory notes executed by the Diversified Group and American Realty.  He also provided fabricated documents to FINRA.

7.      Now, Wilson is attempting to pull off a bait and switch.  He led the investors to believe that were obtaining secured investments in land contract transactions.  At present, Wilson is working to escape his inability to repay the debentures and limited partnership interests by converting those investments into shares of stock in American Realty.  Wilson admitted under oath that making this switch was his plan all along.

8.       In the meantime, Wilson continues to raise money from the public.  As recently as September 26, 2012, he took in $30,000 from an investor.

9.      The Defendants' actions have violated numerous provisions of the federal securities laws. The harm already caused by the Defendants, together with the potential for future harm, call for firm, immediate action by the Court in the public interest.

## DEFENDANTS

10.      **Joel I. Wilson**, age 30, resides in Saginaw, Michigan.  Wilson is the sole owner of Defendant Diversified Group.  Previously, from May 2009 through May 2012, Wilson was the vice-president and co-owner of Diversified Group.  He became the firm's president and sole owner in May 2012.  In October 2012, Wilson resigned from his position as president of Diversified Group.  Wilson is the CEO and a controlling shareholder of Defendant American

Realty.  Wilson also is the sole owner of W R Rice, a registered broker-dealer, and the Diversified Group Advisory Firm, a Michigan-registered investment adviser.  Wilson holds Series 6, 7, 24, 53, 63 and 65 securities licenses from FINRA.

11.     **Diversified Group Partnership Management, LLC**, is a Michigan limited liability company located in Bay City, Michigan.  Diversified Group was founded by Wilson and an associate in May 2009.  Diversified Group served as the general partner of all 17 of the limited partnerships Wilson used to raise money from the public.  Diversified Group also issued the Debentures that Wilson sold to investors.  Wilson dissolved Diversified Group in September 2012.  However, Wilson has stated that he is in the process of reinstating the company's registration with the State of Michigan.

12.     **American Realty Funds Corporation** is a Tennessee corporation with its principal place of business in Bay City, Michigan.  The company was formed in February 2010 by Wilson and an associate.  Wilson and the associate were co-CEOs of American Realty until August 2012, when Wilson's associate resigned and Wilson became the company's sole CEO.  The stock of American Realty is publicly traded and registered with the Commission pursuant to Section 12(g) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78l(g)].  The company files periodic reports, including Forms 10-K and 10-Q, with the Commission pursuant to Section 13(a) of the Exchange Act and related rules thereunder, but it is currently late in filing its Form 10-K for the year ended June 30, 2012 (which was originally due on September 28, 2012 and then extended to October 15, 2012).  Its Form 10-Q for the quarter ended September 30, 2012 was due on November 14, 2012.

## JURISDICTION

13.     This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77v(a)], Sections 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(e) and 78aa], and Section 214 of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. § 80b-14].  Venue is proper in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27 of the Exchange Act [15 U.S.C. §78aa], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14].

14.     The acts, transactions, practices, and courses of business constituting the violations alleged herein occurred within the jurisdiction of the United States District Court for the Eastern District of Michigan and elsewhere.

15.     Defendants, directly and indirectly, have made, and are making, use of the means and instrumentalities of interstate commerce, the means and instruments of transportation and communication in interstate commerce, and the mails, in connection with the acts, transactions, practices, and courses of business alleged herein.

## FACTS

### Background

16.      From at least 2009 through the present, Wilson has engaged in the business of buying, renovating, and reselling properties in and around Bay City, Michigan.

17.     Wilson conducted his real estate business through two companies which he controlled, Defendants Diversified Group and American Realty.  Wilson occupied management positions and held controlling ownership interests in both companies.

18.     American Realty and Diversified Group purchased the properties.  Diversified Group acted as the general contractor for the renovation projects.  After the renovation work was

completed on any given property, a realty company owned by Wilson and his associate then attempted to sell the property.

19.     By the end of 2011, Wilson's companies owned approximately 70 properties in the Bay City area.  American Realty had entered into land contracts for the sale of some of the properties. The properties subject to land contracts were occupied by the buyers, who were supposed to make monthly payments pursuant to their land contracts.  Beginning in July 2012, the remaining properties were either leased to tenants, who were also supposed to make monthly payments, or remained unoccupied.

20.     Beginning in 2009, Wilson hit on the idea of financing his real estate business by raising money from the investing public.  From at least September 2009 through October 2012, Defendant Wilson, personally and through other persons working for him, raised approximately $6.7 million from approximately 120 investors by offering and selling securities tied to his real estate business.

21.     Wilson sold debentures issued by Diversified Group ("the Diversified Debentures"). Wilson also sold interests in limited partnerships ("the Diversified LPs").   (Collectively, the Diversified Debentures and the Diversified LPs are referred to herein as "the Diversified Investments").

22.     The Diversified Investments were sold to Michigan and Indiana residents.  Wilson marketed the Diversified Investments primarily through two registered representatives employed by his registered broker-dealer W R Rice.  The registered representatives obtained all their information about the Diversified Investments from Wilson.

23.     The registered representatives usually met with prospective investors in person.  Many of the investors were long-time customers of the registered representatives.

24.     Many of the investors used proceeds from the sale of their annuities or IRA investments to purchase the Diversified Investments.  For several investors, their investments in the Diversified Investments represented a significant portion of their retirement savings.

25.     The offerings of the Diversified Investments were not registered with the Commission.

**The Diversified Debentures**

26.      From September 2009 through November 2011, Wilson offered investors the opportunity to purchase Diversified Debentures.

27.     The Diversified Debentures carried a 10-year maturity and were supposed to pay 10% annual interest on a semi-annual basis.

28.     The investors, and sometimes Wilson, signed a "Debenture Agreement."  The agreement detailed, among other things, the amount borrowed, the rate of the interest payments, and the terms of redemption.

29.     Investors either wrote a check or had their retirement accounts issue a check to pay for the debentures.  The investor funds were all deposited into Diversified Group's bank account.

30.      Approximately 25 investors bought the Diversified Debentures for a total of approximately $900,000.

31.     Investors received their interest semi-annually and sometimes monthly or quarterly in the form of a check.  They did not reinvest the interest earned.

32.     Wilson and one of his registered representatives offered and sold the Diversified Debentures.  The registered representative told investors that their money would be used for the purchase, renovation, and sale of Michigan real estate, and that the proceeds from the sale of these properties would be used to pay investors their interest payments.

**The Diversified Limited Partnerships**

33.      From September of 2009 through at least September 2012, Wilson offered investors

interests in a series of limited partnerships, the Diversified LPs.  The LPs were pooled

investment vehicles.

34.      In total, Wilson formed 17 LPs.  Diversified Group, under Wilson's control, acted as the

general partner for the LPs.  The investors were the limited partners.  Wilson, through his control

of the general partner, made decisions to invest the LPs' money in notes and stock in return for

compensation.  Wilson sent or caused to be sent, by mail, to investors: correspondence, offering

documents, and account statements.

35.      Wilson drafted an offering document for the Diversified LPs and directed his registered

representatives to distribute copies to investors.  The LP offering document describes, among

other things, the risk factors, the use to be made of investor funds, and the Diversified Group's

financial condition.  Investors either wrote a check or had their retirement accounts issue a

check, all of which were deposited into Diversified Group's bank account.

36.       The LP offering document represented that the Diversified LPs would pay interest to

investors on a monthly basis, at an annual interest rate of 9.9% amortized over 30 years.

37.      The LP offering documents further stated that the investors' money would be used to

purchase the servicing rights of land contracts on residential properties owned either by

Diversified Group or American Realty.

38.      The LP offering document represented that the investors' money would be paid by the

LPs to Diversified Group and in return the LPs would receive (1) a secured interest in the

underlying property in the event of a default through a repurchase agreement executed by

Diversified Group, and (2) the monthly payment stream received from the homebuyers.

According to the LP offering document, the LPs would distribute the monthly payment stream to the limited partners (i.e. the investors) on a pro rata basis.

39.     From the offering documents and oral statements made by the registered representatives, the investors understood that their investment was secured in the event that the homebuyers defaulted on their monthly payments.  Specifically, a marketing brochure prepared by Wilson and given to investors describes the Diversified LPs as an asset backed security in which "the collateral is several single family homes" and that "[s]hould your investment default, you will still own these assets."

40.     Wilson's marketing brochure went further, promising that "[Diversified Group] guarantees to repurchase any non-performing land contracts for the principal amount owed" and representing that Diversified Group had entered into agreements to repurchase from the LPs any property in default.  Likewise, the LP offering document states that, "[Diversified Group] has agreed to repurchase any property which is subject to default."

41.     As a result of these representations, investors believed that their interest was guaranteed.

42.     As with the Diversified Debentures, the registered representatives met with prospective investors and made oral representations about the LPs based on information provided by Wilson.

43.     Wilson knew the substance of what the registered representatives were telling investors. Wilson wrote the LP offering document and directed the registered representatives to distribute the LP offering document and the marketing brochure.  He also conducted training sessions for the new hires, in which he had the two registered representatives rehearse their sales presentation while in his presence.

**Instead of Buying Land Contracts Wilson Began Loaning Money to His Companies**

44.     The LP offering document drafted by Wilson stated that if no suitable land contracts were available for purchase at the time a limited partnership was formed, "[Diversified Group] may loan the proceeds to [American Realty] via a 9 month note at an annual interest of 9.9% amortized over 30 years" in order to "mimic the return on a Land Contract."

45.     Consistent with Wilson's secret plan, this exception quickly became the rule.  Wilson has admitted in sworn testimony that after Diversified LPs 1 through 3 (which closed in approximately August 2011), he no longer invested the LP funds in land contracts.  Instead, he began using the investors' money strictly to make loans to his companies, American Realty and Diversified Group.

46.     Diversified LPs 4 through 17 did not purchase any land contract servicing rights but instead entered into promissory notes under which the investors' money was loaned to either Diversified Group or American Realty.

47.     The LP offering documents' statement that the investors' money *might* be used to make loans was no longer true.  Now, unsecured loans to Wilson's companies had become the exclusive use of investor money.

48.     Wilson admitted in sworn testimony that he never disclosed this change to the investors or the registered representatives who were selling interests in the LPs.

**Wilson's Real Estate Business Has Not Generated Enough Revenue to Repay Investors**

49.     In the LP offering documents, Wilson represented that the income to be paid to investors would be generated from the income from the land contracts.

50.     Many of the LP investors agreed to roll over their accrued monthly income and to use that income to acquire additional units in the LPs.  Only a few investors chose to have their monthly income paid out to them.

51.     Wilson, through Diversified Group, sent each LP investor monthly account statements that reflected, among other things, the specific LPs in which the investor held an interest, the number of units the investor owned, the value of the units, the income that had accrued during the period, and the total amount invested.

52.      Investors relied on these statements as confirmation that the real estate operation was generating sufficient income to pay them their principal and interest.

53.     The monthly statements Wilson distributed to investors were false.  Wilson's real estate business did not generate enough income to make the monthly payments owed to investors.

54.     Records show that during most of the period of the investment offering, those investors who chose to reinvest their payments were provided with monthly account statements which misrepresented that the real estate business had earned sufficient income to make the payments when in fact, it had not.

55.     Wilson and his companies, Diversified Group and American Realty, lack the resources to repay the principal due to investors in the Diversified Debentures, which totals approximately $900,000.

56.     Wilson and his companies, Diversified Group and American Realty, lack the resources to repay the accrued interest and principal due to investors in the limited partnerships, which total, respectively, $6.7 million and $775,000.

57.     As of October 31, 2012, the known bank accounts for Wilson's companies, Diversified Group, American Realty and W R Rice, held only $42,528.

**Wilson Made Excessive, Undisclosed Payments to Employees**

58.     Wilson's LP offering document represents that Diversified Group employed 20 people with a weekly payroll liability of $5,000.

59.     This representation was false.  Beginning in January 2012, the payroll of Diversified Group was at least $130,000 per month, and sometimes closer to $180,000 per month.

**Wilson Diverted $582,000 of the Investors' Money to His Personal Benefit**

60.     Not only has Wilson's real estate business not generated sufficient income to pay off the Debenture and LP investors, he made matters worse by diverting at least $582,000 of investor money to his own personal benefit.

61.     Wilson spent approximately $352,653 from an account containing investor money to pay bonuses to himself and his Diversified Group co-owner.

62.     Wilson spent approximately $75,000 from an account containing investor money to purchase his broker-dealer firm, W R Rice.

63.     Wilson spent approximately $46,780 from an account containing investor money on personal travel, including $4,472 he paid for a birthday trip to Las Vegas in May 2012.

64.     Wilson spent approximately $35,000 from an account containing investor money on his wife's businesses.

65.    Wilson lived in a house paid for with $29,500 from an account containing investor money.  Wilson did not make any monthly payments on that house for several months.

66.    Wilson spent approximately $13,160 from an account containing investor money to purchase a sponsorship for the Saginaw Sting indoor football team.

67.    Wilson spent approximately $9,060 from an account containing investor money on meals.

68.    Wilson spent approximately $7,914 from an account containing investor money to buy tickets to Red Wings games.

69.    Wilson used approximately $4,803 from an account containing investor money to pay for clothing and sporting goods.

70.    Wilson used approximately $4,393 from an account containing investor money to pay expenses related to an entity owned by his sister.

**Wilson Commingled the Investor Money with Other Funds**

71.    Wilson commingled all money he received in one account which included investor money, income from real estate business, and income from W R Rice.

72.     The $6.7 million Wilson took in from investors was by far the biggest source of deposits into Wilson's account.

73.    Wilson also paid all expenses with commingled money from this one account.

**Wilson Secretly Extended the Maturity of His Companies' Notes**

74.    By October 2011, Wilson knew that American Realty could not repay the money it had borrowed from the LPs.

75.    Wilson reached the same conclusion about Diversified Group in early 2012.

76.     Wilson solved the problem by exercising his control over the LPs' general partner (Diversified Group) to extend the maturities of the notes.   Some of these notes originally carried 9-month maturities and others had a 10 year or 11 year maturity date.   Wilson unilaterally, and without notice to the investors of the LPs, extended the maturities of the notes to as much as 11 years.  Some of the notes are not due until the end of 2020.

77.     Wilson's actions constituted a brazen act of self-dealing.  One of his companies— Defendant Diversified Group—is both the general partner of the LPs and one of the borrowers on notes that Wilson extended.  The other borrower is Defendant American Realty, another of Wilson's companies.

78.     Wilson did not communicate with the LP investors to alert them that he had unilaterally extended the maturities of the notes from Diversified Group and American Realty until September 2012.  By then, Wilson knew that both the SEC and FINRA had commenced investigations.

79.     By deviating from the stated use of proceeds disclosed in the offering documents, and by then extending the maturities of the notes, Wilson placed the investors at a significantly higher risk of loss—all without disclosure to the LP investors.

80.     Wilson also failed to disclose to new investors that he had to extend the maturities of the notes due to a lack of funds to repay the money due on the notes.

**Wilson Has Admitted Making Numerous Misrepresentations and Omissions**

81.     In testimony before the FINRA staff, Wilson admitted making misrepresentations and omissions about the investments he offered and sold to investors.

82.     Wilson admitted that Diversified Group owed a fiduciary duty to the limited partners.

83.     Wilson admitted that he decided in April or May 2011 to change the structure of the LP investments from purchasing land contract revenue for the LPs to making unsecured loans to via promissory notes with Diversified Group and American Realty.

84.     Wilson admitted that he did not disclose to investors that the statement in the LP offering document that Diversified Group would use investor funds to purchase the servicing rights of land contracts was false.

85.     Wilson admitted that he did not tell the registered representatives selling the investments that the LPs were no longer buying the servicing rights to land contracts and that the LP offering document was inaccurate.

86.     Wilson admitted that from early on he planned to eventually change the LPs' investments from secured interests in land contract transactions into preferred stock issued by his company, Defendant American Realty.  Wilson admitted that he did not disclose his plan to investors when they purchased interests in the Diversified LPs or to the shareholders of American Realty stock.

87.     Wilson admitted that the statement in the LP offering document that loans might be made to American Realty was inaccurate because the loans were also made to Diversified Group.

88.     Wilson admitted that at the time that the LPs acquired the promissory notes from Diversified Group he did not know whether the business had sufficient assets to meet its capital needs.  He also admitted that at the time that the LPs acquired the promissory notes from Diversified Group he did not know whether there were sufficient funds to satisfy the obligations to the Diversified Group creditors and to the limited partners.

89.     Wilson admitted that he extended the maturity dates on some of the promissory notes held by the LPs because the business had insufficient funds to repay the principal on the notes. He admitted that he did not ask the limited partners if they wanted the maturity dates extended.

90.     Wilson admitted that he realized in late February or early March 2012 that the books and records of his companies were an "abject mess."

91.     Wilson admitted that the LP offering document stated that Diversified Group "shall provide all investors with a detailed written statement of the application of the proceeds of the offering within 6 months after commencement of the offering or upon completion, whichever occurs first, and with annual current balance sheets and income statements to investors thereafter."  Wilson admitted that he never provided this information to investors.

92.     Wilson admitted that the signatures on certain LP offering documents that his staff provided to FINRA appeared to be fabricated.

**Misrepresentations and Misleading Omissions in American Realty's SEC Filings**

93.     American Realty is a publicly-traded company formed in February 2010.

94.     American Realty is the entity through which Wilson bought properties, entered into the land contracts with homebuyers, and sold land contract servicing rights to the Diversified LPs.

95.     Wilson, through the LP offering document, explained that American Realty may be the beneficial owner of some or all of the land contracts purchased by the LP.

96.     Wilson has been a controlling shareholder of American Realty since the company's organization in February 2010.

97.     Wilson was a co-CEO of American Realty, with a business associate, until August 2012 when the associate resigned and Wilson became the company's sole CEO.

98.     On or about May 21, 2012, Wilson caused American Realty to file with the Commission a quarterly report on Form 10-Q for the quarter ended March 31, 2012.  Wilson signed American Realty's March 31, 2012 Form 10-Q.  Wilson also signed a certification, contained in the March 31, 2012 Form 10-Q, that the report contained no materially misleading statements.

99.     Wilson knew at the time, however, that American Realty's March 31, 2012 Form 10-Q contained materially false and misleading statements and that his certification was itself false.

100.    American Realty's March 31, 2012 Form 10-Q stated that American Realty had entered into promissory notes with Diversified LPs 5 through 11 and that American Realty is obligated to make interest payments to the LPs on a monthly basis.  Specifically, according to the terms of the promissory notes, American Realty was required to make monthly interest payments at an annual interest rate ranging from 9.9% to 13.68% on the amount borrowed.

101.    However, bank records show that American Realty has not made any monthly interest payments from March 2012 through September 2012, missing approximately $140,000 in interest payments.

102.    Wilson and American Realty did not disclose in American Realty's Form 10-Q dated March 31, 2012, that as of March 31, 2012, American Realty missed a monthly interest payment of $ 20,306.  The missed interest payments continued through September 2012, totaling approximately $140,000.

103.    On or about August 13, 2012, Wilson caused American Realty to file with the Commission a fifth amended registration statement on Form S-11.  A Form S-11 is the type of form used to register an offering of securities of certain real estate investment companies.  The filing was part of an ongoing attempt by Wilson to register an offering of 2.5 million shares of American Realty stock.  Wilson signed the August 13, 2012 Form S-11.

104.    American Realty's August 13, 2012 Form S-11 falsely states that the proceeds from its stock offering would not be used to pay off the any of American Realty's existing promissory notes.

105.     In fact, Wilson has admitted under oath that contrary to the statement in the Form S-11, he actually intended to use the offering proceeds to pay down or buy out the promissory notes his companies issued to the Diversified LPs.

106.     On or about September 28, 2011, Wilson caused American Realty to file with the Commission an annual report on Form 10-K for the year ended June 30, 2011.  Wilson signed American Realty's June 30, 2011 Form 10-K.  Wilson also signed a certification, contained in the June 30, 2011 Form 10-K, that the report contained no materially misleading statements.

107.     American Realty's June 30, 2011 Form 10-K and its August 13, 2012 Form S-11 both contain misleading descriptions of its purportedly independent directors.

108.     American Realty states in its 2011 Form 10-K that its two independent directors are "independent of management and free of any relationship that would interfere with their independent judgment."

109.     American Realty's Form S-11 dated August 13, 2012 further states that the independent directors are supposed to review and approve any related party transactions that may give rise to the appearance of a conflict of interest.

110.     However, neither American Realty nor Wilson disclose that one of the "independent" directors is a contractor who supplies the carpeting to the real estate properties under renovation and the other "independent" director is Wilson's best friend's wife.

**Restructuring the Diversified Investments**

111.     After being contacted by securities regulators, in September 2012, Wilson sent the investors of the Diversified Debenture and Diversified LPs a packet of correspondence informing them of changes that he was making to their investments effective October 1, 2012.  In that correspondence, Wilson told the Debentures investors that the promissory notes they obtained

18

from Diversified Group would be "forgiven" and likewise, Wilson told the LP investors that the Diversified Group and American Realty promissory notes held by the LPs would be "forgiven." In exchange, investors were going to receive shares in American Realty stock plus a promissory note that would make quarterly interest payments at an annual rate of 8.5% with a termination date in 30 years.

112.    The value of this restructured investment is approximately 30% to 40% less than the investors' originally investments.  Wilson admitted in his FINRA testimony that if he did not renegotiate the original terms of the investment, the investors would face defaults on the notes with Diversified Group and American Realty.  Wilson did not disclose any of those facts in the correspondence to the investors.

113.    Wilson also did not give investors the opportunity to request their money back.

**Wilson and His Companies Cannot Repay the Debenture Holders and LP Investors**

114.    Wilson and his companies lack the money to repay the principal due to the Debenture holders.

115.     Wilson and his companies lack the money to repay the accrued balances due the LP investors.

**COUNT I**
**Unregistered Offer and Sale of Securities**
**Violations of Section 5(a) and (c) of the Securities Act**
**[15 U.S.C. § 77e(a) and (c)]**
**(Against Wilson and Diversified Group)**

116.    Paragraphs 1 through 115 above are realleged and incorporated herein by reference.

117.    By their conduct as alleged above, Wilson and Diversified Group, directly or indirectly:

(i) made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to

which no registration statement was in effect; (ii) for the purpose of sale or delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, securities as to which no registration statement was in effect; and (iii) made use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy, through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

118.    No valid registration statement was filed or was in effect with the Commission in connection with Wilson's and Diversified Group's offer and sale of the Diversified Debentures and the Diversified LPs.

119.    By reason of the foregoing, Wilson and Diversified Group have violated Sections 5(a) and (c) of the Securities Act [15 U.S.C. § 77e(a) and (c)].

### COUNT II
### Fraud in the Offer and Sale of Securities
### Violations of Section 17(a)(1) of the Securities Act
### [15 U.S.C. § 77q(a)(1)]
### (Against Wilson and Diversified Group)

120.    Paragraphs 1 through 115 above are realleged and incorporated herein by reference.

121.     By their conduct as alleged above, Wilson and Diversified Group, in the offer or sale of the Diversified Debentures and the Diversified LPs, by the use of any means or instruments of transportation or communication in interstate commerce and by the use of the mails, directly or indirectly, have employed devices, schemes or artifices to defraud.

122.    Wilson and Diversified Group acted with scienter.

123.    By reason of the foregoing, Wilson and Diversified Group violated Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

**COUNT III**
**Fraud in the Offer and Sale of Securities**
**Violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act**
**[15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)]**
**(Against Wilson and Diversified Group)**

124.     Paragraphs 1 through 115 above are realleged and incorporated herein by reference.

125.     By their conduct as alleged above, Wilson and Diversified Group, in the offer or sale of the Diversified Debentures and the Diversified LPs, by the use of any means or instruments of transportation and communication in interstate commerce and by the use of the mails, directly or indirectly, have obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or have engaged in transactions, practices or courses of business which have been operating as a fraud or deceit upon purchasers of securities in the form of the Diversified Debentures and the Diversified LPs.

126.     By reason of the foregoing, Wilson and Diversified Group violated Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

**COUNT IV**
**Fraud in Connection the Purchase and Sale of Securities**
**Violations of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5**
**Thereunder**
**[17 C.F.R. § 240.10b-5]**
**(Against Wilson, Diversified Group, and American Realty)**

127.     Paragraphs 1 through115 above are realleged and incorporated herein by reference.

128.      By their conduct as alleged above, Wilson, Diversified Group, and American Realty, in connection with the purchase or sale of the Diversified Debentures and the Diversified LPs, by the use of any means or instrumentalities of interstate commerce or by the use of the mails, directly or indirectly: (a) employed a device, scheme or artifice to defraud; (b) made untrue statements of material fact and omitted to state material facts necessary in order to make the

statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in an act, practice, or course of business which has been or is operating as a fraud or deceit upon other persons, including purchasers and sellers of such securities.

129.    Wilson, Diversified Group, and American Realty acted with scienter.

130.    By reason of the foregoing, Wilson, Diversified Group, and American Realty have violated Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].

### COUNT V
**False and Misleading Periodic Reports Filed with the SEC**
**Violations of Section 13(a) of the Exchange Act [15 U.S.C. §78m(a)]**
**and Rules 12b-20, 13a-1, and 13a-13 Thereunder**
**[17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13]**
**(Against American Realty)**

131.    Paragraphs 1 through 115 above are realleged and incorporated herein by reference.

132.    Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)], and Rules 13a-1 and 13a-13 thereunder [17 C.F.R. §§ 240.13a-1 and 240.13a-13], require issuers of registered securities to file with the Commission factually accurate annual reports and quarterly reports.  Exchange Act Rule 12b-20 [17 C.F.R. § 240.12b-20] further provides that, in addition to the information expressly required to be included in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they were made not misleading.

133.    On or about September 28, 2011, American Realty filed with the Commission an annual report on Form 10-K for the year ended June 30, 2011.  This report was false and misleading in that it makes false statements about the independence of its named independent directors.

134.    On or about May 21, 2012, American Realty filed with the Commission a quarterly report on Form 10-Q for the quarter ended March 31, 2012.  This report was false and misleading in that it omits to disclose that American Realty has missed monthly payments to the LPs and has therefore underreported its liabilities.

135.    American Realty has not to date filed with the Commission its Form 10-K for the period ending on June 30, 2012.  American Realty was required to file this document by the original deadline of September 28, 2012 and then by the extended deadline of October 15, 2012.

136.    American Realty has not to date filed with the Commission its Form 10-Q for the period ended September 30, 2012.   American Realty was required to file this document by November 14, 2012.

137.    By reason of the foregoing, American Realty violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)], and Exchange Act Rules 12b-20, 13a-1 and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13].

<u>COUNT VI</u>
**False Certifications Filed with the SEC**
**Violations of Section 13(a) of the Exchange Act [15 U.S.C. §78m(a)]**
**and Rule 13a-14 Thereunder [[17 C.F.R. § 240.13a-14]**
**(Against Wilson)**

138.    Paragraphs 1 through 115 above are realleged and incorporated herein by reference.

139.    At all relevant times, Wilson was the Chief Executive Officer or Co-Chief Executive Officer of American Realty.

140.    At all relevant times, American Realty was required to file annual and quarterly reports under Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)].

141.    On or about September 28, 2011, Wilson caused to be filed with the Commission on behalf of American Realty an annual report on Form 10-K for the year ended June 30, 2011.

That report contained a personal certification by Wilson indicating that he had reviewed the report and that based on his knowledge the report did not contain any materially misleading statements.

142.    In fact, the American Realty Form 10-K for the year ended June 30, 2011 contained materially misleading statements as alleged in paragraphs 131 through 137 above.

143.    Wilson knew that the American Realty Form 10-K for the year ended June 30, 2011 contained materially misleading statements when he certified that it did not contain any materially misleading statements.

144.    On or about May 21, 2012, Wilson caused to be filed with the Commission on behalf of American Realty a quarterly report on Form 10-Q for the quarter ended March 31, 2012.   That report contained a personal certification by Wilson indicating that he had reviewed the report and that based on his knowledge the report did not contain any such materially misleading statements.

145.    American Realty's Form 10-Q for the quarter ended March 31, 2012 contained materially misleading statements about as alleged in paragraphs 131 through 137 above.

146.    Wilson knew that the American Realty Form 10-Q for the year ended March 31, 2012, contained materially misleading statements when he certified that it did not contain any such materially misleading statements.

147.    By reason of the foregoing, Wilson has violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rule 13a-14 thereunder [17 C.F.R. § 240.13a-14].

## COUNT VII
### Investment Adviser Fraud
### Violations of Section 206(4) of the Advisers Act [15 U.S.C. §80b-6(4)]
### and Rule 206(4)-8 Thereunder [17 C.F.R. 275.206(4)-8]
### (Against Wilson)

148.   Paragraphs 1 through 115 above are re-alleged and incorporated herein by reference.

149.   Wilson acted as an investment adviser to the Diversified LPs.  Wilson, in exchange for compensation, made decisions to invest the money of the Diversified LPs in notes issued by Diversified Group and American Realty and to exchange for some of those notes for preferred stock to be issued by American Realty.

150.   Wilson, while acting as an investment adviser to pooled investment vehicles, made untrue statements of material facts or omitted to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, to investors or prospective investors, or otherwise engaged in acts, practices, or courses of business that are fraudulent, deceptive, or manipulative with respect to investors or prospective investors.

151.   By engaging in the conduct described above, Wilson violated Section 206(4) of the Advisers Act [15 U.S.C. §80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. 275.206(4)-8].

## COUNT VIII
### Aiding and Abetting Liability
### Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)]
### (Against Wilson)

152.   Paragraphs 1 through 137 above are realleged and incorporated herein by reference.

153.   Diversified Group violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] as described in Count IV above, which is incorporated by reference as if set forth fully herein.

154.   American Realty violated Sections 10(b) and 13(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(a)] and Rules 10b-5, 12b-20, 13a-1, and 13a-13 thereunder [17 C.F.R. §§

240.10b-5, 240.12b-20, 240.13a-1, and 240.13a-13] as described in Counts IV and V above, which are incorporated by reference as if set forth fully herein.

155. Wilson, in the manner set forth above, knowingly or recklessly provided substantial assistance to Diversified Group and American Realty in connection with their violations of the above-stated provisions.

156. By reason of the foregoing, and pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Wilson aided and abetted Diversified Group's and American Realty's violations of the above-stated provisions.

157. Pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Wilson is deemed to be in violation of the above-stated provisions to the same extent as Diversified Group and American Realty.

### COUNT IX
**Control Person Liability**
**Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)]**
**(Against Wilson)**

158. Paragraphs 1 through 137 are realleged and incorporated by reference as if set forth fully herein.

159. Diversified Group violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5] as described in Count IV above, which is incorporated by reference as if set forth fully herein.

160. American Realty violated Sections 10(b) and 13(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(a)] and Rules 10b-5, 12b-20, 13a-1, and 13a-13 thereunder [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, 240.13a-13] as described in Counts IV and V above, which are incorporated by reference as if set forth fully herein.

161.     As set forth in paragraphs 1 through 115 above, Wilson controlled the day-to-day affairs of Diversified Group and American Realty and possessed, directly or indirectly, the power to direct or cause the direction of the Diversified Group and policies of Diversified Group and American Realty.  Wilson was involved in the formulation and execution of the illegal acts by Diversified Group and American Realty described in paragraphs 1 through 137 above.

162.     Wilson directly or indirectly controlled Diversified Group and American Realty within the meaning of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

163.     Wilson knowingly or recklessly, directly or indirectly, induced acts constituting violations of Sections 10(b) and 13(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(a)] and Rules 10b-5, 12b-20, 13a-1, and 13a-13 [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, 240.13a-13] promulgated thereunder.

164.     Wilson is liable as a control person for Diversified Group's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] promulgated thereunder.

165.     Wilson is liable as a control person for American realty's violations of Sections 10(b) and 13(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(a)] and Rules 10b-5, 12b-20, 13a-1, and 13a-13 thereunder [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, 240.13a-13].

166.     Pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], Wilson is liable jointly and severally with and to the same extent as Diversified Group and American Realty.

## **RELIEF REQUESTED**

**WHEREFORE,** the Commission respectfully requests that the Court enter a judgment

A.     Making findings of fact and conclusions of law that the Defendants committed the alleged violations.

B.      Permanently enjoining Defendant Wilson, his agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from further violations of Sections 5(a), 5(c), 17(a)(1), 17(a) (2) and 17(a) (3) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)(1), (2) and (3)];  Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78o(a)(1)] and Rules 10b-5(a), (b), and (c) promulgated thereunder [17 C.F.R. § 240.10b-5(a), (b), and (c)]; aiding and abetting violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules, 12b-20, 13a-1, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13]; violations of Rule 13a-14 under the Exchange Act [17 C.F.R. § 240.13a-14]; violations of Section 206(4) of the Advisers Act [15 U.S.C. §80b-6(4)] and Rule 206(4)-8 [17 C.F.R. 275.206(4)-8] thereunder; and violations as a control person under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] .

C.      Permanently enjoining Defendant Diversified Group, its agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from further violations of Sections 5(a), 5(c), 17(a)(1), 17(a) (2) and 17(a) (3) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)(1), (2) and (3)]; and Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78o(a)(1)] and Rules 10b-5(a), (b), and (c) promulgated thereunder [17 C.F.R. § 240.10b-5(a), (b), and (c)].

D.      Permanently enjoining Defendant American Realty, its agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from further violations of Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78o(a)(1)] and Rules 10b-5(a), (b), and (c) promulgated thereunder [17 C.F.R. § 240.10b-5(a), (b), and (c)]; and violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and

Rules, 12b-20, 13a-1, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13].

E.      Ordering Defendants to disgorge, jointly and severally, their ill-gotten gains, derived directly or indirectly from the conduct complained of herein, together with prejudgment interest thereon;

F.      Ordering Defendants to pay appropriate civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

G.      Order barring Defendant Wilson from serving as an officer or director of any public company pursuant to Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2);

H.      Retaining jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and to carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of the Court; and

I.      Granting such further relief as the Court may deem appropriate.


                                    Respectfully submitted,


DATED: November 15, 2012            s/ John E. Birkenheier
                                    JOHN E. BIRKENHEIER
                                    STEVEN L. KLAWANS
                                    TRACY W. LO

                                    Attorneys for Plaintiff
                                    U.S. SECURITIES AND
                                    175 West Jackson Boulevard, Suite 900
                                    Chicago, Illinois 60604
                                    Telephone: (312) 886-3947 (Birkenheier)
                                    Telephone: (312) 886-1738 (Klawans)

Telephone: (312) 353-1805 (Lo)
Facsimile:   (312) 353-7398
E-mail: BirkenheierJ@sec.gov
E-mail: KlawansS@sec.gov
E-mail: LoT@sec.gov

LOCAL COUNSEL
BARBARA L. McQUADE
United States Attorney

s/ Peter A. Caplan
PETER A. CAPLAN
Assistant U.S. Attorney
211 W. Fort Street, Ste. 2001
Detroit, MI 48226
(313)226-9784
P-30643
Email:  peter.caplan@usdoj.gov