UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

U.S. SECURITIES AND
EXCHANGE COMMISSION,

                    Plaintiff,

v.                                                    Case Number 12-cv-15062
                                                      Honorable Thomas L. Ludington
JOEL WILSON et al.,

                    Defendants.
_____/


**OPINION AND ORDER GRANTING IN PART AND HOLDING IN
ABEYANCE IN PART PLAINTIFF'S MOTION FOR A PRELIMINARY
INJUNCTION, ASSET FREEZE, AND OTHER EMERGENCY RELIEF**


"The mission of the U.S. Securities and Exchange Commission is to protect investors, maintain fair, orderly, and efficient markets, and facilitate capital formation."[1]  The principal way that the SEC fulfills its mission is by enforcing federal securities laws, including by bringing civil lawsuits.

This is such a case.  On November 15, 2012, Plaintiff Securities and Exchange Commission filed suit in this Court against Defendant Joel Wilson and two of his companies, Defendants Diversified Group Partnership Management, LLC, and American Realty.  Plaintiff alleges that Defendants violated several federal securities laws, including making an unregistered offer and sale of securities in violation of 15 U.S.C. § 77e, and committing fraud in the offer and sale of securities in violation of 15 U.S.C. § 77q.

---

[1] Securities and Exchange Commission, *The Investor's Advocate: How the SEC Protects Investors, Maintains Market Integrity, and Facilitates Capital Formation*, http://www.sec.gov/about/whatwedo.shtml (last visited November 20, 2012).

The same day as Plaintiff filed its complaint, it filed a motion for a preliminary injunction, asset freeze, and other emergency relief.  For reasons detailed below, the motion will be granted in part and held in abeyance in part.  The request for expedited discovery will be granted.  The request for a preliminary injunction and an asset freeze will be held in abeyance pending a hearing, which will be scheduled for December 10, 2012, at 10 am.

## I

The following allegations are taken from the complaint and are recounted here by way of background.  No presumption of truth should be inferred from their inclusion here.

## A

Wilson is in the business of flipping houses in Bay City, Michigan.  Compl. ¶ 2.  His business model is straightforward.  Buy a property.  Fix it up.  Resell it via land contract for a profit.  Simple enough.  The manner that he organizes and funds his business, however, is far less simple.

Wilson conducts his business through at least four companies — W R Rice; Diversified Group Advisory Firm; Defendant Diversified Group Partnership Management, LLC; and Defendant American Realty Funds Corporation — and as many as 17 limited partnerships.  *Id.* ¶¶ 2, 10.

W R Rice is a registered broker-dealer.  *Id.* ¶  10.  Diversified Group Advisory Firm is a registered investment advisor.  *Id.*  Diversified Group Partnership Management, a Michigan limited liability company, serves as the general partner of each of the 17 limited partnerships.  *Id.*

Wilson funds his business through soliciting investments.  Compl. ¶ 3.  It is this public involvement that has brought the scrutiny of Plaintiff and the Financial Industry Regulatory Authority (FINRA).

**B**

Since 2009, Wilson has obtained about $6.7 million from 120 investors. Compl. ¶ 3. Diversified Group Partnership Management has raised about $900,000; American Realty, $5.8 million. *Id*.

Diversified Group Partnership Management raised the funds by selling debentures, a type of unsecured promissory note. Compl. ¶ 3. Prospective investors were told that the debentures would carry a ten year term and offer a 10 percent interest payment disbursed semi-annually. *Id*. ¶ 27. They were also told "that their money would be used for the purchase, renovation, and sale of Michigan real estate, and that the proceeds from the sale of these properties would be used to pay investors their interest payments." *Id*. ¶ 32.

American Realty raised the funds by selling limited partnership interests. Prospective investors were given an "offering document" claiming to describe both "the use to be made of investor funds" and "the Diversified Group's financial condition." Compl. ¶ 35. The investor funds would be used, the offering document explained, to facilitate land contracts on the refurbished houses. Specifically, the funds would be given by the limited partnerships to Diversified Group Partnership Management. *Id*. ¶ 38. In return, the limited partnerships would receive "(1) a secured interest in the underlying property in the event of a default through a repurchase agreement executed by Diversified Group, and (2) the monthly payment stream received from the homebuyers." *Id*. Thus, the investment promised a steady, secured revenue stream.

The offering document went on, however, to caution that the funds could be put to another use "if no suitable land contracts were available." Compl. ¶ 44. The offering document specified: "Diversified Group may loan the proceeds to American Realty via a nine month note

at an annual interest rate of 9.9% amortized over 30 years in order to mimic the return on a land

contract." *Id*. (brackets and quotation marks omitted). Rather than a backup plan, however,

Wilson soon made this the primary use of the investors' funds. *Id*. ¶ 45.

## C

The first three limited partnerships, as promised in the offering document, invested in

land contracts. Compl. ¶ 45. These partnerships were dissolved in 2011. *Id*. The next fourteen

limited partnerships "did not purchase any land contract servicing rights but instead entered into

promissory notes under which the investors' money was loaned to either Diversified Group or

American Realty." *Id*. ¶ 46. For limited partnerships 4 through 17, that is, "unsecured loans to

Wilson's companies had become the exclusive use of investor money." *Id*. ¶ 47. Wilson has

since "admitted that he decided in April or May 2011 to change the structure of the LP

investments from purchasing land contract revenue for the LPs to making unsecured loans to

[Diversified Group Partnership Management and American Realty] via promissory notes." *Id*. ¶

83.

## D

Despite this repurposing, however, Wilson was not able "generate enough income to

make the monthly payments owed to investors." Compl. ¶ 52. Presently, the principal and

accrued interest due to Wilson's investors is $6.7 million. *Id*. ¶ 56. Wilson does not have it.

"As of October 31, 2012, the known bank accounts for Wilson's companies, Diversified Group,

American Realty and W R Rice, held only $42,528." *Id*. ¶ 57.

A challenging market and unsuccessful business model is only partly to blame for the

shortfall. Compl. ¶ 60. Wilson has also diverted at least $582,000 of investor money to his own

personal benefit. To take three examples, "Wilson spent approximately $352,653 from an

account containing investor money to pay bonuses to himself and his Diversified Group co-owner." *Id.* ¶ 61. "Wilson spent approximately $46,780 from an account containing investor money on personal travel, including $4,472 he paid for a birthday trip to Las Vegas in May 2012." *Id.* ¶ 63. And "Wilson spent approximately $7,914 from an account containing investor money to buy tickets to Red Wings games." *Id.* ¶ 68.

To conceal the shortfall, Wilson tried to convince the limited partnership investors "to roll over their accrued monthly income and to use that income to acquire additional units in the LPs." Compl. ¶ 50. Most agreed. He then sent them monthly account statements that "misrepresented that the real estate business had earned sufficient income to make the payments." *Id.* 54.

In the fall 2011, Wilson realized that even this was not going to be sufficient to conceal the shortfall. Compl. ¶ 74. So he unilaterally changed the terms of the promissory notes, deferring repayment to the investors. Specifically, Diversified Group Partnership Management, acting as the general partner for each of the 17 limited partnerships, extended the maturity of the promissory notes that Diversified Group and American Realty had executed in favor of the limited partnerships (which, in turn, would repay the investors). *Id.* ¶¶ 76–80. Wilson has since "admitted that he extended the maturity dates on some of the promissory notes held by the LPs because the business had insufficient funds to repay the principal on the notes." *Id.* ¶ 89. Investors were not told of the change until Plaintiff and FINRA commenced their investigations. *Id.* ¶ 78.

### E

American Realty is a publically traded corporation, and it is therefore required to file quarterly reports with Plaintiff (SEC Form 10-Q reports). Compl. ¶ 93. On its Form 10-Q for

the first quarter of 2012, American Realty reported that it "had entered into promissory notes with Diversified LPs 5 through 11 and that American Realty is obligated to make interest payments to the LPs on a monthly basis." *Id*. ¶ 100. The report was filed on March 31, 2012. *Id*. Bank records reveal that American Realty missed making its monthly interest payment in March 2012. *Id*. This missed payment was not disclosed on the Form 10-Q. *Id*. ¶ 102.

American Realty's finances experienced continued strain in the months that followed. April 2012, another missed interest payment. Compl. ¶ 101. *Id*. May, June, July, August, and September 2012, more missed payments. *Id*. Collectively, American Realty missed making payments of about $140,000.

## F

Still searching for capital, Wilson hit upon a stock offering. In August 2012, he filed with Plaintiff a notice of intent to offer 2.5 million shares of American Realty stock. Compl. ¶ 103. The notice (filed on SEC Form S-11) specifies that "the proceeds from its stock offering would not be used to pay off . . . any of American Realty's existing promissory notes." *Id*. ¶ 104. Wilson has since "admitted under oath that contrary to the statement in the Form S-11, he actually intended to use the offering proceeds to pay down or buy out the promissory notes his companies issued to the Diversified LPs." *Id*. ¶ 105.

## G

After Plaintiff and FINRA began investigating his activities, Wilson sent a packet to his investors notifying them of changes he was going to make to their investments. Compl. ¶ 111. Effective October 1, 2012, Wilson informed them, the promissory notes that Diversified Group Partnership Management and American Realty had executed in their favor would be "forgiven." *Id*. In exchange, Wilson explained, "investors were going to receive shares in American Realty

stock plus a promissory note that would make quarterly interest payments at an annual rate of 8.5% with a termination date in 30 years." *Id*. Investors were not given the opportunity to opt out of this modification. Id. ¶ 113. The practical effect of this change was an investment haircut — it shaved 30 to 40 percent off the investment's value. *Id*.

### H

On November 15, 2012, Plaintiff filed suit against Defendants in this Court alleging violations of federal securities laws. The complaint alleges that Defendants: (1) made an unregistered offer and sale of securities in violation of 15 U.S.C. § 77e; (2) committed fraud in the offer and sale of securities in violation of 15 U.S.C. § 77q; (3) committed fraud in the purchase and sale of securities in violation of 15 U.S.C. § 78j; (4) filed false and misleading reports with Plaintiff in violation of 15 U.S.C. § 78m; (5) filed false certifications with Plaintiff in violation of 15 U.S.C. § 78m; and (6) committed investment advisor fraud in violation of 15 U.S.C. § 80b-6.

The same day, Plaintiff filed a motion for a preliminary injunction, asset freeze, and other emergency relief (ECF No. 2) and a motion for the appointment of a receiver (ECF No. 6). No proof of service on Defendants has yet been filed.

### II

The motion for a preliminary injunction, asset freeze, and other emergency relief seeks five types of relief in two stages. The five types of relief sought are: (1) a preliminary injunction and temporary restraining order; (2) a freeze of Defendants' assets; (3) an accounting; (4) a prohibition on the alteration or destruction of documents; and (5) expedited discovery.

Plaintiff does not, however, request that the relief all be granted immediately. Rather, Plaintiff explains that it "seeks to depose witnesses, subpoena bank and brokerage records and

other documents, and take other discovery on an expedited basis prior to a preliminary injunction hearing." Pl.'s Br. Supp. Preliminary Inj. Mot. 15, ECF No. 3. Similarly, regarding the preservation of documents, Plaintiff explains: "Several courts have entered document preservation directives at the inception of SEC enforcement actions." *Id.* at 15 (collecting cases). Plaintiff thus seeks a stepped remedial approach — some types of relief immediately, others after the hearing.

## A

Federal Rule of Civil Procedure 26 provides: "A party may not seek discovery from any source before the parties have conferred as required by Rule 26(f), except . . . when authorized by these rules, by stipulation, or by court order." Fed. R. Civ. P. 26(d)(1). The advisory committee notes explain that orders authorizing expedited discovery "will be appropriate in some cases, such as those involving requests for a preliminary injunction." Fed. R. Civ. P. 26 advisory committee notes (1993).

This is such a case. Accordingly, following the filing of proof of service on Defendants, the parties will be granted leave to immediately schedule depositions, issue subpoenas, and serve interrogatories, requests for documents, and requests for admissions. The time to respond to such discovery requests will be shortened to seven calendar days after a request is served. Service of all discovery, including subpoenas, may be effected via overnight mail, facsimile, or electronic means. Additionally, Defendants will be prohibited from the alteration or destruction of documents or other information relating to Plaintiff's allegations in the complaint.

**B**

Plaintiff's motion does not expressly specify whether it seeks an asset freeze prior to the preliminary injunction hearing. But Plaintiff does specify what it would like frozen. In a proposed order submitted by Plaintiff with its motion, Plaintiff proposes that this Court order

> that until otherwise ordered by this Court any and all assets of defendants Joel I. Wilson, Diversified Group Partnership Management, LLC, and American Realty Funds Corporation (referred to below as "Defendants"), in whatever form such assets may presently exist and wherever located (including funds, accounts, insurance policies, real estate, automobiles, marine vessels, contents of safe deposit boxes, precious metals, other personal property, cash, securities, free credit balances, fully paid-for securities, and/or property pledged or hypothecated as collateral for loans, and all other assets), held in the name of the Defendants, and/or held for the Defendants' benefit or on their behalf, including through corporations, companies, trusts, partnerships, agents, nominees, friends or relatives; and all other funds, accounts, and other assets to which proceeds from the Defendants' violations can be traced or which were acquired with proceeds of the Defendants' violations are hereby frozen.

One condition precedent to depriving Defendants of their property in this manner, however, is Defendants having notice and an opportunity to be heard. *See Warren v. City of Athens*, 411 F.3d 697, 708 (6th Cir. 2005) ("Procedural due process generally requires that the state provide a person with notice and an opportunity to be heard before depriving that person of a property or liberty interest."); *Elliott v. Kiesewetter*, 98 F.3d 47, 60 (3d Cir. 1996) (discussing due process in asset freeze context). Moreover, the Second Circuit cautions, "the decision to order a temporary freeze on defendants' assets as ancillary relief in an SEC enforcement action requires particularly careful consideration by the district court." *SEC v. Manor Nursing Ctrs., Inc*., 458 F.2d 1082, 1105 (2d Cir. 1972).

Here, Plaintiff has not demonstrated that it has provided Defendants notice of Plaintiff's demands. Likewise, Defendants have not yet been afforded an opportunity to be heard on those demands. Thus, any demand for an asset freeze is premature. Accordingly, the request for an

-9-

asset freeze, like the request for a preliminary injunction and accounting, will be held in abeyance pending a hearing on the motion.

**III**

Accordingly, it is **ORDERED** that Plaintiff's motion for a temporary injunction, asset freeze, and other emergency relief is **GRANTED IN PART AND HELD IN ABEYANCE IN PART**.

It is further **ORDERED** that Plaintiff is directed to serve a copy of this opinion and order on Defendants and file proof of service on this Court's docket.

It is further **ORDERED** that following the filing of proof of service on Defendants, the parties are granted leave to immediately schedule depositions, issue subpoenas, and serve interrogatories, requests for documents, and requests for admissions.  The time to respond to such discovery requests is shortened to seven calendar days after a request is served.  Service of all discovery, including subpoenas, may be effected via overnight mail, facsimile, or electronic means.

It is further **ORDERED** that Defendants are prohibited from altering or destroying documents or other information regarding Plaintiff's allegations in the complaint.

It is further **ORDERED** that Plaintiff's request for a preliminary injunction, asset freeze, and accounting are **HELD IN ABEYANCE** pending a hearing on the motion.

It is further **ORDERED** that a hearing will be held on the motion on **Monday, December 10, 2012, at 10 am**.

Dated: November 20, 2012

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on November 20, 2012.

s/Tracy A. Jacobs
TRACY A. JACOBS